**UNITED STATES BANKRUPTCY COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | | |
|---|---|---|---|
| IN RE: | **BRUCE RAYMOND WAINER, Sr.** | : | **Chapter 7** |
| | **STELLA THALMER WAINER,** | : | |
| | | : | |
| | **Debtors** | : | **Bky. No. 20-14046 ELF** |

# O P I N I O N

## I.  INTRODUCTION

Section 522(d)(10)(E) of the Bankruptcy Code allows a debtor to exempt from property

of the estate a debtor's right to receive:

> (E) a payment under a stock bonus, pension, profitsharing, annuity, or similar plan
> or contract on account of illness, disability, death, age, or length of service, to the
> extent reasonably necessary for the support of the debtor and any dependent of the
> debtor . . . .

11 U.S.C. §522(d)(10)(E).[1]

In this case, Debtors Bruce Raymond Wainer, Sr. and Stella Thalmer Wainer ("the

Debtors") invoked §522(d)(10)(E) and claimed as exempt their interest in a Pacific Life Annuity

("the Annuity").  The chapter 7 Trustee ("the Trustee") filed an Objection to the exemption

claim.

The Trustee contends that the Debtors' right to receive payments from the Annuity is not

exempt under 11 U.S.C. §522(d)(10)(E) for the following reasons:

1.  the Annuity is not an exemptible "annuity" under §522(d)(10)(E);

---

[1]    The Trustee does not argue that the statutory limitations to this exemption — listed at subsections
(d)(10)(E)(i)–(iii), concerning plans established by insiders who employed the debtor — apply here.

2.  the Annuity payments are not "on account of  .  .  .  .  age;" and

3.  the Annuity payments are not "reasonably necessary" for the support of the Debtors.

To support their respective positions, both parties cite to cases in which courts have applied the factors outlined in In re Andersen, 259 B.R. 687 (B.A.P. 8th Cir. 2001).  However, I question the logic for applying the Andersen factors — which were developed in applying a state exemption statute — to the federal exemption statute at §522(d)(10)(E).  In addition, in my view, the Supreme Court's decision in Rousey v. Jacoway, 544 U.S. 320 (2005), has undermined reliance on a number of the factors.

As explained below, I conclude that, regardless of whether I apply the Andersen factors or a simpler set of standards, the Debtors' claim of exemption under §522(d)(10)(E) is proper.  Therefore, the Trustee's Objection will be overruled.

## II.  FACTS

### A.  Procedural History

The Debtors, Bruce and Stella Wainer, filed a chapter 7 bankruptcy petition on October 9, 2020.

In Schedule A/B, the Debtors listed as personal property seven (7) Individual Retirement Accounts ("IRAs") cumulatively valued at $534,327.59, two (2) pensions of unknown value, and a Pacific Life Annuity (the "Annuity") valued at $131,310.59.  The remainder of the Debtors' assets listed in Schedule A/B totaled only around $10,000.00.

In Schedule C, the Debtors selected the federal exemptions and claimed as exempt the entire amount of the IRAs, pensions, and the Annuity payments under 11 U.S.C. §§522(d)(10), (12).

The Trustee filed the Objection to the Debtors' claimed exemption of the Annuity payments on January 8, 2021.  This court held a hearing on the Objection on May 7, 2021.  The parties thereafter submitted memoranda in support of their positions, the last of which was filed on June 11, 2021.

## B.    The Debtors

Ms. Wainer and Mr. Wainer are seventy-eight (78) and eighty (80) years old, respectively.  (Hr'g Pt. 2 at 5:50; Bankr. No. 20-14046-elf, Doc. #23 at 7).[2]   Both Debtors are retired.

During their working years, the Debtors participated in the limited employer retirement plans available to them.  (Hr'g Pt. 2 at 4:30).  Mr. Wainer earned two (2) modest pensions during his employment at Lockheed Martin and Boeing.  Ms. Wainer worked as a pre-school teacher for most of her working years, but her employer did not provide retirement benefits.  She subsequently worked for Fidelity Bank, where she earned a small pension.  (Hr'g Pt. 2 at 4:00).

To supplement their pensions, the Debtors contributed the maximum allowable amounts — a few thousand dollars per year — to their IRA accounts.  (Hr'g Pt. 2 at 5:00).  In addition, when they were able, they set aside funds every month to invest for retirement in a Schwab

---

[2]       The hearing on May 7, 2021, was conducted by video conference via Zoom.  Rather than have the hearing reduced to a transcript, the parties opted to cite to the recorded hearing.  The hearing was held and recorded in two (2) parts; therefore, this Opinion will specify the part and the timestamp of the cited testimony.

3

account.  (Hr'g Pt. 2 at 3:15, 5:30).  Ms. Wainer received a $13,000.00 lump-sum payout for her

Fidelity Bank pension in 2011 and deposited that money into the Schwab account.  (Hr'g Pt. 2 at

2:45, 49:30).

The Debtors purchased the Annuity in 2013 for $150,000.00, using funds from their

Schwab account.[3]  (Hr'g Pt. 2 at 2:45; Debtors' Ex. D-1 (hereinafter "Annuity Contract") at 3).[4]

In 2016, the Debtors began curtailing life expenses to pay creditors.  They dined out less,

reduced spending on entertainment, took no vacations and did not buy new clothes.  (Hr'g Pt. 2

at 14:30-15:30).  The Debtors continued to make payments of about $3,000.00 per month on

their debts until they filed bankruptcy in October 2020.  To make these payments, they sold some

of their stock holdings and tapped into a line of credit.  (Hr'g Pt. 2 at 13:00).

In 2016, the Debtors also entered into a resident contract with ACTS Retirement-Life

Communities.  ("ACTS Contract") (Debtors' Ex. D-5).  On June 29, 2016, they paid

$291,900.00 to secure a three-bedroom unit at a retirement community called Spring House

Estates.  (ACTS Contract at 13).

Spring House Estates is a long-term facility; it provides assisted living and other medical

care if necessary, and the Debtors may stay for life after signing.  (Hr'g Pt. 2 at 9:00).  The

resident contract states that the Debtors will not be forced out of Spring House Estates simply

because their future income fails to cover their expenses.  (ACTS Contract at 27-28).

As of the date of signing, monthly rent for the Debtors' unit was $4,567.00.  (ACTS

Contract at 5).  They paid an additional $8,034.64 for modifications to the unit, such as flooring

---

[3]    After purchasing the Annuity, the Schwab account balance was about $22,000.00, which the
Debtors put towards the entrance fee at Spring House Estates — a retirement community where they
currently reside.  (Hr'g Pt. 2 at 50:30).

[4]    Citations to the parties' exhibits are to the PDF page numbers.

changes, cabinet upgrades, and a wall-mounted safe.  (ACTS Contract at 42).  At some point, the

Debtors moved from their three-bedroom unit to a two-bedroom "combo apartment."  (Hr'g Pt. 2

at 33:05).  They thought this move would reduce their rent, but instead they received a

$20,000.00 refund from their initial deposit in July 2020.  (Hr'g Pt. 2 at 33:15).  The Debtors put

this $20,000.00 into a checking account, and used it to pay some debts, attorney fees, and back

taxes.  (Hr'g Pt. 2 at 34:15).

The ACTS Contract provides that the Debtors' rent may be adjusted from time to time.

(ACTS Contract at 21).  Ms. Wainer testified that the rent has increased by three (3) to five (5)

percent (3%-5%) every year.  (Hr'g Pt. 2 at 16:00).  As of April 2021, the rent was

approximately $5,366.00 per month.  (Hr'g Pt. 2 at 16:00).

In addition to securing occupancy, the Debtors' rental payments provide them with other

services, such as limited meal allowances and basic medical care.   (ACTS Contract at 11, 13-

16).  The Debtors have medical and dental plans to supplemental the medical care that they

receive through their ACTS Contract.  (Hr'g Pt. 2 at 9:00, 17:30).

The Debtors are required to withdraw a certain percentage from their IRAs each year.

Ms. Wainer estimated that the required minimum distribution was ten percent (10%), although

they have withdrawn more in prior years.  (Hr'g Pt. 2 at 19:45, 36:45).

Ms. Wainer is Mr. Wainer's full-time caretaker.  She testified that ACTS required her to

take on this role because Mr. Wainer has a myriad of medical problems, including a history of

seizures and strokes, dementia, and difficulty walking.  (Hr'g Pt. 2 at 7:00).  Ms. Wainer also has

medical issues of her own.  She requires cataract surgery in the near future and receives therapy

for sciatica nerve issues.  Although the Debtors' supplemental medical insurance covers some of

these costs, her cataract surgery alone will require about $1,300.00 in co-pay and travel

expenses.  (Hr'g Pt. 2 at 7:30).

### C.   The Annuity

Jason King, Head of Product Management for a company called Income Solutions Group,

testified at the hearing regarding the Annuity.

The Annuity is a "non-qualified annuity," meaning that the account was funded with

post-tax dollars.  (Hr'g Pt. 1 at 32:45).  The Annuity is also a "deferred annuity," meaning that an

annuitant can draw income from the account at any time.  (Hr'g Pt. 1 at 35:45).  However, if any

gains in a deferred annuity account are withdrawn prior to the annuitant's reaching the age of 59

½, the IRS imposes a ten percent (10%) tax penalty on that withdrawal.  (Hr'g Pt. 1 at 31:00).

That tax penalty is not assessed for withdrawals after the annuitants have reached age 59 ½.

(Hr'g Pt. 1 at 31:15).

Once an annuitant who has reached the age of 59 ½ begins to withdraw income from the

account, a "protected base" amount is locked in place.  (Hr'g Pt. 1 at 50:30; Annuity at 33, 36).

From that point on, the annuitant can withdraw five percent  (5%) of the protected base amount

each year, for life.  (Hr'g Pt. 1 at 48:45).  If the annuitant withdraws more than five percent (5%)

of the protected base in a year, the protected base amount may decrease, which would reduce the

amount of guaranteed income for the next year.  (Hr'g Pt. 1 at 38:15).  The protected base can

increase if the account value rises to a sufficient level, but such an increase rarely occurs once an

annuitant starts drawing income from the account.  (Hr'g Pt. 1 at 37:30, 47:30).

The Annuity grants the Debtors general control over the corpus of the account.  They can

choose between three (3) investment options and withdraw the full account value at any time.

(Hr'g Pt. 1 at 40:15).  The Annuity contract permits the Debtors to transfer ownership of the Annuity, although such a transfer may generate certain tax consequences.  (Hr'g Pt. 1 at 40:45). The Debtors can also change the Annuity's beneficiaries at any time.  (Hr'g Pt. 1 at 41:15).

As of March 31, 2021, the Annuity had a "current value" of $155,090.20 and a "surrender value" of $151,365.84.  (Debtors' Ex. D-3 at 1).  The surrender value is the amount that the Debtors could receive as a lump sum if they chose to cash out the Annuity contract. (Hr'g Pt. 1 at 40:00).  The protected base amount is $165,824.07.  (Debtors' Ex. D-3 at 1).   If unaltered, this protected base amount will provide the Debtors with a little over $8,000.00 per year in guaranteed income for life.  (Hr'g Pt. 1 at 49:30).

At the time they purchased the Annuity in 2013, Mr. Wainer was seventy-two (72) years old and Ms. Wainer was seventy (70) years old.  (Hr'g Pt. 1 at 25:45).  The Debtors started taking monthly distributions from the annuity immediately.  (Hr'g Pt. 1 at 25:45).  Their decision to purchase the Annuity was part of the Debtors' personal retirement planning; they wanted additional guaranteed retirement income to cover their current and future expenses.  (Hr'g Pt. 1 at 26:15, 46:00).  The Debtors do not intend to redeem or liquidate any increased value in the Annuity because they believe they need the income.  (Hr'g Pt. 1 at 52:30).

### III.  DISCUSSION

Generally speaking, when a debtor file a bankruptcy case, "all legal or equitable interests of the debtor[s] in property" become the property of the bankruptcy estate and are available for distribution to the debtors' creditors.  11 U.S.C. §541(a)(1).  In order to facilitate a financial fresh start, the Bankruptcy Code permits debtors to exempt from the estate certain interests in property.  See, e.g., 11 U.S.C. §522(b)(1); Rousey v. Jacoway, 544 U.S. 320, 325 (2005).

A debtor's claimed exemptions are presumptively valid.  See 11 U.S.C. §522(l) (property claimed as exempt is exempt in the absence of an objection by a party in interest).  When objecting to an exemption, the objector bears the burden of proving that the exemption was not properly claimed.  Fed. R. Bankr. P. 4003(c).

Section 522(d)(10)(E) of the Bankruptcy Code, quoted at the outset of this Opinion, contains three (3) requirements for the exemption to apply.  To qualify for the exemption, a debtor's right to receive the payments:

> (1) . . . must be from "a stock bonus, pension, profitsharing, annuity, or similar plan or contract";
>
> (2) . . . must be "on account of illness, disability, death, age, or length of service"; and
>
> (3) . . . may be exempted only "to the extent" that it is "reasonably necessary [to] support" the accountholder or his dependents.

Rousey, 544 U.S. at 325-26 (final alteration in original) (quoting 11 U.S.C. §522(d)(10)(E)).

The Trustee objects to the Debtors' claim that the payments from their Annuity are exempt under §522(d)(10)(E), contending that none of these statutory requirements has been met.

## A.  On Account of Age

I will begin with the second element.  The Trustee argues that Debtors' right to receive payments under the Annuity is not "on account of . . . age," as required by §522(d)(10)(E).  I disagree.

**1.**

The Supreme Court in <u>Rousey</u> laid down the applicable standard:  the right to receive

payments is "on account of age" if it arises "because of" age.  544 U.S. at 326.  In other words,

the right to receive payment must be "causally connected" to the debtor's age.  <u>Id.</u> at 327.  The

right to such payment need not arise *solely* because of age; a plan that substantially deters early

access to funds will suffice.  <u>See id.</u> at 327, 328 n.3.

In <u>Rousey</u>, the Court applied this standard to the debtors' right to receive payments from

their IRAs.  It was undisputed that the debtors could opt to receive payment of their entire IRA

balances at any time.  Nevertheless, the Court found that the debtors' right to receive such

payments were "on account of age" due to a ten percent (10%) tax penalty that the IRS imposed

on withdrawals before the age of 59 ½.  The Court determined that this age-based penalty was

"substantial," <u>id.</u> at 327, and effectively deterred early access to the entire balance of the IRA.

Because that access-limiting condition was removed when the accountholder reached 59 ½, the

Court concluded that the debtors' right to payments from the IRAs was "on account of age."  <u>Id.</u>

at 327-29.

The Debtors' Annuity is a non-qualified and deferred annuity, meaning it is funded with

post-tax dollars and the gains in the account are not taxed until they are withdrawn.  (Hr'g Pt. 1

at 32:45).  Similar to its treatment of IRAs, the IRS imposes a ten percent (10%) tax penalty on

annuity withdrawals prior to age 59 ½, but only on withdrawn *gains* the annuity account has

accrued.  (Hr'g Pt. 1 at 31:00).  Thus, while the traditional IRAs under discussion in <u>Rousey</u>

imposed a ten percent (10%) penalty on the entire amount of early withdrawals, the Debtors'

Annuity only imposes that penalty on any account gains that are withdrawn.

For this reason, the age-based tax penalty for early withdrawals from the Debtors'

Annuity, in certain circumstances, may be smaller than the penalty for early withdrawals from

traditional IRAs.  The effective tax penalty imposed is variable and depends on both the total

gains in the account and the amount withdrawn.[5]

**2.**

Since the effective tax penalty for early withdrawals from the Debtors' Annuity would

have been lower than the tax penalty for early withdrawals from traditional IRAs (at least where

they withdrew more than the gains in the account), one could argue that the Annuity's barrier to

early access is not "substantial" enough to render the payments "on account of age."  However,

for a few reasons, I reach the opposite conclusion.

First, <u>Rousey</u> did not set an absolute floor regarding the degree of deterrence to early

withdraw that a plan must impose to satisfy §522(d)(10)(E).  The Court explicitly left open the

issue of "whether penalties of less than 10 percent or of a fixed amount would also be a sufficient

---

[5]       Assume that an annuitant holds an annuity (identical to the Debtors' Annuity) that has
doubled in value since its purchase.  If the annuitant is below the age of 59 ½, then she could withdraw
the entire corpus of the annuity for an effective tax penalty of five percent (5%).  The annuitant would pay
a ten percent (10%) penalty on half of the account value withdrawn (the gains to the account) and would
incur no tax penalty for withdraw of the other half (the principal investment).  By contrast, a traditional
IRA accountholder would have to pay a full ten percent (10%) penalty upon liquidation of the account
regardless of the principal-to-gains ratio.

The effective tax penalty in this liquidation scenario would vary depending on the gains in the
account.  If the annuity has not appreciated in value since the investment, the annuitant would pay no tax
penalty for an early withdrawal.  Conversely, the greater the appreciation of the account, the greater the
effective penalty becomes — though always short of 10 percent (10%).

Switching to a non-liquidation scenario also affects the effective tax penalty rate an annuitant
would pay for an early withdrawal.  If the annuitant only withdrew the gains (or a lesser amount) from the
account, then the effective tax penalty will be the same as that faced by the IRA accountholder: ten
percent (10%).

10

barrier to early withdrawal." Id. at 328 n.2.  I recognize that holding for the Debtors in this case would represent an extension of Rousey — at least with regard to the "on account of age" element — but Rousey did not hold that plans with lesser age-based penalties were out of bounds.

Second, the IRS Code presumes that any funds withdrawn from an annuity are pulled first from the gains in the account.  See 26 U.S.C. §§72(e)(2)-(3).  Thus, the applicable ten percent (10%) penalty on early withdrawals will apply up to its maximum amount on the account before the annuitant will be able to withdraw the principal investment without penalty.  For example, if an annuitant has an annuity worth $100,000 and $10,000 of that value represents investment gains, then the annuitant will face a full ten percent (10%) penalty on any early withdrawals up to $10,000.  Such a penalty structure still provides an effective and substantial barrier to withdrawal prior to age 59 ½.[6]

Third, the Annuity contract itself creates incentives for the accountholder to leave funds in the account until retirement age.  The Annuity does not create a protected payment base amount (and therefore guaranteed income) until the accountholder is at least 59 ½ years old.  (See Annuity Contract at 33, 36).  This provision encourages accountholders to abstain from taking early withdrawals, as doing so could cause the amount of future guaranteed income to drop.[7]  This is a substantial disincentive to withdraw funds that is tied to the age of the annuitant.

---

[6]    One court noted the difference between the IRS tax penalty's application to the gains rather than the full value of the account, but the distinction did not figure into its ruling as to the exemption claim. See In re Michael, 339 B.R. 798, 806 (Bankr. N.D. Ga. 2005).

[7]    The Annuity Contract emphasizes this point, stating that certain withdrawals prior to age 59 ½ "COULD REDUCE THE FUTURE BENEFITS BY MORE THAN THAT DOLLAR AMOUNT OF THE WITHDRAWAL."  (Annuity Contract at 36).

For these reasons, I find that the Debtors' right to payment under the Annuity is

sufficiently connected to their age to satisfy the "on account of age" requirement of

§522(d)(10)(E).

**3.**

The Trustee also argues that because the Debtors purchased the annuity when they both

were older than 59 ½, their "right to receive payments was always and remains unconditional,

and not premised on . . . age." (Tr. Mem. at 6). I am unpersuaded by this argument.

In essence, the Trustee's argument would lead to a categorical disallowance of

§522(d)(10)(E) exemptions where a debtor has acquired the right to payments after he had

exceeded the age at which the age-based restrictions applied. However, as courts have

explained, the salient issue is not whether a debtor is at or near retirement age when he purchases

an annuity, but whether the right to receive payment has a causal connection to his age. See,

e.g., In re Andersen, 259 B.R. 687, 693 (B.A.P. 8th Cir. 2001).[8] As already explained, I find that

the age-based tax penalty and contractual incentive together create a barrier sufficient to make

the payments "on account of age."

I agree with those courts that have rejected such a categorical disallowance.

Individuals who have already exceeded the age of 59 ½ still need to prepare for

retirement. See In re Cassell, 443 B.R. 200, 212 (Bankr. N.D. Ga. 2010) ("The fact the Debtor

---

[8]    In its ruling, the Andersen panel also cited a prior Eighth Circuit case for the proposition that "the debtor may not have access to or control over the timing of the annuity payments" for a payment to be on account of age. Andersen, 259 B.R. at 693 (citing In re Huebner, 986 F.2d 1222, 1225 (8th Cir. 1993)). This holding has been implicitly overruled by Rousey, as there is no question that the Rousey debtors had nearly complete control (subject only to the ten percent (10%) early-withdrawal tax penalty and future required minimum distributions) over the timing of their IRA payments. See Rousey, 544 U.S. at 327-29, 331-32.

had already exceeded [59 ½] when she purchased the annuity cannot automatically disqualify her without the Court holding that no person over the age of 59 ½ can prepare for retirement. Given that workers in general are working longer and frequently past the age of 65, such a per se rule makes no sense"), aff'd 713 F.3d 81 (11th Cir. 2013).   Some individuals, particularly the self-employed, may be more likely to purchase a replacement income plan (like an annuity) after they reach retirement age.  See Andersen, 259 B.R. at 692 (refining the established §522(d)(10)(E) analysis so as to include those who did not have access to employer-sponsored plans from the exemption).

There is nothing in §522(d)(10)(E) or its legislative history indicating that a debtor must earn or contribute to an annuity, pension, IRA, or other type of income replacement plan before a certain age for the exemption to apply.  See Silliman v. Cassell, 738 S.E.2d 606, 612 (Ga. 2013) (applying the Rousey "on account of age" standard to a similar state exemption statute, and noting that "nothing in [the state exemption statute] indicates an intent to limit application of the exemption to annuities purchased before the payee attains a certain age").  Automatically disqualifying such persons from an entire category of exemptions on the grounds that they had already reached a certain age when they obtained the right of payment would undermine the congressional intent of permitting debtors to maintain resources necessary for retirement.[9]

It also appears likely that the Third Circuit would reject the imposition of such a limiting rule regarding §522(d)(10)(E).

In 1983, a Third Circuit panel drew a distinction between a debtor's *present* right to receive payments and a right to receive *future* payments.  See In re Clark, 711 F.2d 21, 23 (3d

---

[9]    Also, such a rule would engender other difficulties in application, such as when a debtor contributed or earned entitlement to a retirement plan or contract both before and after the age at which benefits could be withdrawn penalty-free.

Cir. 1983), overruled by In re Krebs, 527 F.3d 82 (3d Cir. 2008).  Based upon a perceived goal

of Congress to limit the exemption to sources that provided present support of the debtor, rather

than long-term security, the Clark court affirmed a bankruptcy court's order denying a 43-year-

old debtor's claimed exemption in a retirement plan that he could not access, without penalty,

until the age of 59 ½.  Id. at 22-23.  In essence, Clark created an additional limitation on

§522(d)(10)(E):  a debtor could not claim an exemption in a right to payment of future benefits.

However, after Rousey, the Third Circuit overruled Clark.  In re Krebs, 527 F.3d 82 (3d

Cir. 2008).  The Krebs court held that Clark's imposition of "a sort of fourth requirement" to

§522(d)(10)(E) had been undermined by Rousey's reasoning.  Id. at 87.  The Krebs court noted

that Rousey had focused on the plain language of §522(d)(10)(E) and — other than the three

requirements identified — imposed no additional limitation to its application.  Id.

The Trustee's suggested categorical disallowance is something of an inverse of the now-

rejected Clark rule.  Rather than prohibiting a debtor from claiming the §522(d)(10)(E)

exemption when she is *younger* than the age-triggering point at which such retirement benefits

are freely accessible, the Trustee's rule would prohibit a debtor from claiming the

§522(d)(10)(E) exemption where she has acquired the right to such benefits at an age *older* than

the plan's age-triggering point.

This inverse analogy may be imperfect, but the reasoning of Rousey and Krebs makes it

clear that courts should not engraft additional requirements for claiming the §522(d)(10)(E)

exemption beyond those found in the text.  Accordingly, I decline the Trustee's invitation to do

so.

## B.  "Annuity" under 11 U.S.C. §552(d)(10)(E)

Next, the Trustee argues that the Debtors' Annuity is not an "annuity" as courts have

defined that term in §522(d)(10)(E).  Again, I disagree.

## 1.

Section 522(d)(10)(E) lists five (5) categories of plans from which payments may be

exempted: "stock bonus, pension, profitsharing, annuity, or similar plan or contract."  The

Bankruptcy Code does not provide a definition for the term "annuity."  Nevertheless, courts

consistently hold that the mere title of "annuity" does not render a plan or contract the type of

annuity that Congress intended to exempt.  In re Cassell, 443 B.R. at 204 (collecting cases).

In the absence of a statutory definition, courts have relied upon other interpretive tools to

parse §522(d)(10)(E).  For instance, the Supreme Court quoted Webster's Dictionary, which

defines an "annuity" as "an amount payable yearly or at other regular intervals . . . for a certain

or uncertain period."  Rousey, 544 U.S. at 330 (alteration in original) (citation omitted); see also

In re Eilbert (Eilbert II), 162 F.3d 523, 526 & n.3 (8th Cir. 1998) (citing Black's Law Dictionary

90 (6th ed.1990)); In re Roberts, 2007 WL 666923, at *2 (Bankr. E.D. Ark. Feb. 26, 2007)

(same).

Some courts have also looked to associated statutory terms.  For example, because

"annuity" is a "broad and generic" term and only "refers to the method of payment and not to the

underlying nature of the asset," the Eighth Circuit reasoned that an "annuity" would possess

qualities similar to other enumerated retirement or investment plans.  See Eilbert II, 162 F.3d at

526-27 (8th Cir. 1998) (quoting Eilbert v. Pelican (Eilbert I), 212 B.R. 954, 958 (B.A.P. 8th Cir.

1997)). [10]  Since these other enumerated retirement or investment plans are "created to fill or

supplement a wage or salary void," the Eilbert II court concluded that an annuity under

§522(d)(10)(E) must replace lost income.  Id. at 527 (citation omitted); see also In re Michael,

339 B.R. 798, 803-04 (Bankr. N. D. Ga. 2005) (same).

Courts also have sought guidance from legislative history.  The House Report declares

the purpose of §522(d)(10)(E), which is to "exempt[] certain benefits that are akin to future

earnings of the debtor."  H.R. Rep. No. 95-595, at 361-62 (1977).  As one court opined: "This

stated congressional intent has in recent years led judicial opinion to coalesce around the idea

that the language in § 522(d)(10)(E) is intended to exempt employment retirement benefits or the

like."  In re Green, 2007 WL 1031677, at *2 (Bankr. E.D. Tenn. Apr. 2, 2007) (collecting

cases). [11]

This emerging judicial consensus accords with the Supreme Court's analysis in Rousey.

There, the Court addressed whether the §522(d)(10)(E) term "similar plan or contract" included

IRA's.  The Court noted that the enumerated plans listed in §522(d)(10)(E) — stock bonus,

pension, profitsharing, and annuity — share a "common feature":  they each "provide a

substitute for wages . . . and are not mere savings accounts."  Rousey, 544 U.S. at 329-31.

---

[10]    The court in Eilbert II was interpreting an Iowa exemption statute — Iowa Code §627.6(8)(e) —
that was based on 11 U.S.C. §522(d)(10)(E).  See Eilbert II, 162 F.3d at 526.  I discuss this Iowa
exemption statute in more detail below.  See n.14, infra.


[11]    Accord In re Stanley, 2006 WL 6811019, at *6 (B.A.P. 9th Cir. Feb. 2, 2006) (requiring
some sort of wage replacement "activates Congress' intent to make § 522(d)(10)(E) an exemption for
retirement income plans"); In re Caslavka, 179 B.R. 141, 144 (Bankr. N.D. Iowa 1995) (exemption of
wage substitutes supports "the basic requirements of life at a time when the debtor's earning capacity is
limited").

Thus, it is well established that for an annuity to be exemptible under §522(d)(10)(E), it must provide a debtor with income that substitutes for wages.

In making this determination with respect to a particular annuity, courts have examined "the facts and circumstances surrounding the purchase of the contract, as well as the nature and contents of the contract." In re Andersen, 259 B.R. 687, 691 (B.A.P. 8th Cir. 2001). The Andersen court listed factors that courts have considered:

1. Were the payments designed or intended to be a wage substitute?

2. Were the contributions made over time?

3. Do multiple contributors exist?

4. What is the return on investment?

5. What control may the debtor exercise over the asset?

6. Was the investment a prebankruptcy planning measure?

Id. at 691-92; see also Eilbert I, 212 B.R. at 958-59. Courts have not treated any particular factor as dispositive. See Cassell, 443 B.R. at 205.

Both parties to this matter have cited to the Andersen factors as the test for determining whether the Annuity is an exemptible "annuity" under §522(d)(10)(E). However, I have doubts regarding the propriety of employing some of the Andersen factors with respect to the federal bankruptcy exemption statute, 11 U.S.C. §522(d)(10)(E).[12] The history of these Andersen factors, and the impact of the Supreme Court's holding in Rousey on the continuing viability of those factors, warrants further examination.

---

[12]     Obviously, neither the Eilbert cases nor Andersen is binding authority on this court.

**2.**

**a.**

The Andersen factors appear to have originated in — or at least gained significant prominence following — the Eilbert cases.[13]  In Eilbert, a debtor, aged seventy-seven (77), had claimed an exemption in a $450,000 single-premium variable annuity under an Iowa exemption statute, Iowa Code §627.6(8)(e).  Eilbert I, 212 B.R. at 955-56.  Similar to the federal exemption at §522(d)(10)(E), Iowa Code §627.6(8)(e) permitted debtors to exempt a right to payment from annuities on account of age.[14]

---

[13]    A few prior cases had examined the exemptibility of IRAs and annuities.  See, e.g., In re Matthews, 65 B.R. 24 (Bankr. N.D. Iowa 1986); In re Pauquette, 38 B.R. 170 (Bankr. D. Vt. 1984); In re Howerton, 21 B.R. 621 (Bankr. N.D. Tex. 1982), supplemented, 23 B.R. 58 (Bankr. N.D. Tex. 1982).  Although there was no formal list of factors at that time, at least some courts were attempting to confine the §522(d)(10)(E) exemption to benefits akin to future earnings.  See Pauquette, 38 B.R. at 173 (discussing the "test which has developed to determine whether a contract provides benefits akin to future earnings").

[14]    The Iowa exemption statute was based on (and had similar language to) the federal exemption at §522(d)(10)(E).  See Eilbert II, 162 F.3d at 526.  Iowa Code §627.6.8.e. provided an exemption for a debtor's rights in:

> A payment or a portion of a payment under a pension, annuity, or similar plan or contract on account of illness, disability, death, age, or length of service, unless the payment or a portion of the payment results from contributions to the plan or contract by the debtor within one year prior to the filing of a bankruptcy petition, which contributions are above the normal and customary contributions under the plan or contract, in which case the portion of the payment attributable to the contributions above the normal and customary rate is not exempt.

In anticipation of a large judgment being entered against her,[15] and as an act of prebankruptcy planning, the debtor liquidated much of her property and used the proceeds to purchase the $450,000 annuity.  Id. at 956.  The bankruptcy court sustained the trustee's challenge to the claimed exemption on the grounds that the annuity's payments were not on account of the debtor's age.  Id. at 959-60 & n.13.

On appeal, the Bankruptcy Appellate Panel of the Eighth Circuit affirmed.  As the Eilbert I court noted, the "exemptibility of annuities under Iowa Code" was at that time "an ill-defined area of law of comparatively recent origin."  Id. at 957.  Prior caselaw interpreting §627.6.8.e had focused on the statutory requirement that exemptible annuity payments be "on account of age," but had not addressed whether the underlying annuity itself fell within the statutory ambit.  See id. at 957-58 (discussing cases).

Based on the Iowa legislature's intent to "protect those payments which serve as wage substitutes after retirement," the Eilbert I decision identified four (4) factors that the court believed were indicative of whether a particular plan or contract (including annuities) provided wage substitutes.  Id. at 958.  These factors were "contributions over time," "contributions by others," "return on investment," and "control over annuity."  Id. at 958-59.

The court anchored the factors "contributions over time" and "contributions by others" to its perception that the Iowa exemption statute "clearly" contemplated retirement plans that had been established through an "on-going course of investment" with multiple contributors.  Id. Therefore, short investment periods and investments purchased outside of the employment context would cut against exemptibility.  See id.  In the court's view, these factors limited the

---

[15]     The debtor's husband was killed in an automobile accident that severely injured another driver; this other driver sued the husband's estate and the debtor as joint owners of the car.  Eilbert I, 212 B.R. at 955-56.

exemption to annuities purchased as a result of "long-standing retirement strateg[ies]" and guarded against exempting annuity payments reflecting "merely a recent change in the nature of the asset." Id. Other than a reference to the Iowa statute's design to protect wage substitute payments, the court did not provide any citations in support of these two (2) factors.

The court appeared to base the "return on investment" and "control over annuity" factors on a similar statutory-design rationale. Id. at 959. Investments that computed payments based on a debtor's estimated life span and terminated on death would be more likely to satisfy the Iowa exemption statute. By contrast, an investment that merely returned the debtor's contribution with interest would be more likely to be non-exempt. Id. Similarly, the more control a debtor was able to exercise over the investment, the more likely it was to fall outside of the exemption. The existence of plan restrictions on a debtor's ability to withdraw the corpus favored exemptibility, while unlimited discretion to withdraw cut against it. Id. Together, the court viewed consideration of these factors as also supporting the goal of limiting the Iowa exemption to plans created as part of long-standing retirement strategies.

Applying these four (4) factors to the debtor's exemption claim in her $450,000 single-premium variable annuity, the court easily concluded that the debtor's annuity did not fall within the category of exemptible annuities under Iowa Code §627.6(8)(e). The debtor had not contributed to the annuity over time, and she was the sole contributor. The annuity merely returned the debtor's investment funds with interest, and she could liquidate the corpus at any time. Her annuity was therefore non-exempt. Id. at 959-60 & n.13.[16]

---

[16]    The court also held that the annuity's payments were not "on account of age." Eilbert I, 212 B.R. at 959-60 & n.13.

On appeal, the Eighth Circuit affirmed the judgment of the Bankruptcy Appellate Panel.
See Eilbert II, 162 F.3d at 525.

The Eilbert II court noted that the Iowa exemption statute — originally drafted in 1981
— had been modeled on and was nearly identical to the federal exemption at §522(d)(10)(E).  Id.
at 525-26.  However, in 1986, the Iowa legislature amended its exemption statute.  The 1986
amendments broadened the Iowa exemption by removing language — that the federal exemption
still contains — limiting the exemption to annuity payments "reasonably necessary for the
support of the debtor."  Id. at 526-27.  The 1986 amendments simultaneously contracted the
exemption by adding a restriction not contained in the federal version:  payments resulting from
annuity contributions by the debtor within a year of the bankruptcy petition were excluded to the
extent that they were "above the normal and customary contributions under the plan or contract."
Id. (quoting Iowa Code §627.6.8.e).  Specifically in light of the latter change, the court opined
that since single-premium annuity contracts have no "normal and customary contributions,"
"most such annuities are outside the purview of § 627.6(8)(e)."  Id.

The Eighth Circuit further concluded that the annuity payments did not replace lost
income, and the annuity "was not purchased with contributions over time as part of a long term
retirement strategy."  Id. at 527.  Instead, the annuity was purchased with non-exempt assets "as
a prebankruptcy planning measure by a prospective debtor who happened to have already
reached retirement age."  Id.  Accordingly, the court affirmed the Bankruptcy Appellate Panel's
judgment that the debtor's annuity payments were not exemptible under Iowa Code §627.6(8)(e).
Id.

**b.**

The Bankruptcy Appellate Panel of the Eighth Circuit revisited the issue of exemptible annuities in 2001, this time interpreting the federal exemption statute at §522(d)(10)(E).  See In re Andersen, 259 B.R. 687 (B.A.P. 8th Cir. 2001).

Citing both Eilbert I and Eilbert II, the Andersen court reiterated the four (4) factors pronounced in Eilbert I and added two (2) additional factors for courts to consider:  whether the payments were "designed or intended to be a wage substitute" and whether the investment was a "prebankruptcy planning measure."  Id. at 691-92.  The Andersen court did not discuss the differences between the federal and Iowa exemption statutes, and the court appears to have assumed that the factors recognized for the Iowa exemption statute were equally applicable to adjudicating an exemption claim under the federal statute.  See id. ("Having concluded that these factors must be examined, we apply them to the undisputed facts of this particular case.").

The Andersen court applied the six (6) factor test to a debtor's claim of an exemption in an annuity that she purchased with a single payment of $40,000.  Id. at 689.  The debtor had received an inheritance at the age of fifty-eight (58) and, since her employer did not offer any pension or retirement plans, she used those inheritance funds to purchase the annuity.  Nearing retirement age five years later, the debtor exercised her rights under the annuity contract to specify the date — one (1) year later — on which she would receive benefits.  Doing so extinguished the debtor's rights to withdraw the corpus of the annuity.

The debtor and her husband filed for bankruptcy nearly seven (7) years after making that election and claimed the annuity payments as exempt.  Id. at 690.  At that time, their income consisted of payments from Social Security and the debtor's annuity (together, approximately $1,350.00/month).  Id.

The court held that the debtor was entitled to exempt her annuity payments under §522(d)(10)(E), id. at 694, determining that four (4) of the six (6) factors favored exemption. The debtor intended the annuity payments to replace wages in retirement.  Much like a pension, the return on her investment was significantly tied to her lifespan.  The debtor had no ability to withdraw the corpus of the annuity at the time she filed for bankruptcy.  And, the purchase of the annuity, thirteen (13) years prior to bankruptcy, was not a prebankruptcy planning measure to shield assets.

The two (2) factors cutting against exemptibility were given only minimum weight in light of the circumstances.  Although the debtor purchased the annuity with a single payment and there were no other contributors, her employer did not offer her any retirement options.  The court opined that in such circumstances, it would be unfair to penalize debtors who self-funded retirement plans.[17]

On balance, the Andersen court concluded that the debtor's annuity fell within the ambit of exemptible plans under §522(d)(10)(E).

### 3.

Since Andersen, other courts have applied the six (6) Andersen factors to §522(d)(10)(E) and analogous state exemption statutes.  See, e.g., In re Rove, 505 B.R. 502, 506 (Bankr. E.D. Wis. 2013) (federal exemption statute); Cassell, 443 B.R. at 205 (Georgia exemption statute); In

---

[17]     The court also emphasized that the facts of its case were significantly different from the "rather egregious" facts presented in Eilbert.  259 B.R. at 692.  Eilbert involved a prebankruptcy plan to protect significant assets from execution on an impending judgment.  By contrast, the debtor in Andersen had purchased a small annuity thirteen years prior to bankruptcy for the purpose of self-funding a retirement plan because her employer did not provide any retirement options.  Id. at 689, 692-93.

re Taylor, 620 B.R. 911, 916 (Bankr. W.D. Mo. 2020) (Missouri exemption statute); In re

Vickers, 408 B.R. 131, 139 (Bankr. E.D. Tenn. 2009) (Tennessee exemption statute); In re

Jadud, 2012 WL 4757870, at *3 (Bankr. N.D. Ohio Oct. 5, 2012) (Ohio exemption statute).

However, I question the propriety of employing some of the Andersen factors with

respect to the federal bankruptcy exemption statute.  The genesis of these factors — arising out

of a case interpreting a materially different state exemption statute — appears to have been

accepted without critical scrutiny by some courts in applying 11 U.S.C. §522(d)(10)(E).

In addition, the Supreme Court's subsequent decision in Rousey may have further

undermined some of the Andersen factors.  See Rousey, 544 U.S. at 325.

As noted, in Rousey, the Supreme Court addressed whether the §522(d)(10)(E) term

"similar plan or contract" included IRAs.[18]  Therein, the Court laid down some interpretive

guideposts for the term "annuity" in §522(d)(10)(E).

The Court recognized that "annuity" is a generic term without definition in the

Bankruptcy Code.  Id. at 330.  Thus, the Court relied upon various dictionary definitions

showing that annuities provide yearly or other regular payments for various period of time.  Id.

The Court also recognized that while employers "establish and contribute to stock bonus,

profitsharing, and pension plans or contracts," individuals "can establish and contribute to an

annuity on terms and conditions [they] select[]."  Id. at 331.  At bottom, the common feature

identified by the Court that all the plans listed in §522(d)(10)(E) share is that they "provide

income that substitutes for wages."  Id.

---

[18]     The Court handed down its decision on April 4, 2005.  Just a few weeks later, on April 20, the
Bankruptcy Abuse Prevention and Consumer Protection Act was signed into law, which explicitly added
IRA's to the list of exemptible property.  See 11 U.S.C. §522(d)(12).

Analyzing whether an IRA met this standard, the Court found four (4) features of IRAs to be probative.

First, IRAs have minimum distribution requirements.  Account holders must begin withdrawing funds in the year after they turn 70 ½, when "they are likely to be retired and lack wage income." Id.

Second, the IRS defers taxation of money held in IRAs until the year in which it is distributed.  This "encourages accountholders to wait until retirement to withdraw the funds." Id. at 331-32.

Third, withdrawals before age 59 ½ are subject to a tax penalty, which restricts "preretirement access to the funds." Id. at 332.

And fourth, failure to withdraw the required minimum results in a fifty percent (50%) tax penalty on funds improperly remaining in the IRA.  Id.  Taken together, the Court found that these features demonstrated that "IRA income substitutes for wages lost upon retirement and distinguish IRAs from typical savings accounts." Id.

### 4.  Analysis of the Andersen factors

Next, I will evaluate the Debtors' exemption claim under §522(d)(10)(E) through the prism of the Andersen factors, while also considering the impact of Rousey, and with a critical eye regarding the propriety of those factors.

### a.   Were the payments designed or intended to be a wage substitute?

The first <u>Andersen</u> factor asks whether the payments claimed as exempt were designed or intended to be a wage substitute.

This factor was not explicitly discussed in either of the <u>Eilbert</u> cases and did not receive much treatment in <u>Andersen</u>.  The unstated justification seems to be something of an inverse of the sixth <u>Andersen</u> factor: that the exemption should apply when debtors obtain investments that will provide wage-replacing income and should not apply when debtors seek to engage in improper prebankruptcy asset conversion.  In that regard, I perceive no material difference between the federal and Iowa exemption statutes.  Both provide exemptions for payments from plans (such as annuities) that provide income in replacement of lost wages.  This first <u>Andersen</u> factor furthers that broad legislative purpose by taking a debtor's intent into account.  The differences between the two exemption statutes are inconsequential as to this factor.

This first <u>Andersen</u> factor also is in harmony with <u>Rousey</u>.  There, the Supreme Court focused its analysis on whether the plan or contract provides income that substitutes for wages — not the debtor's intentions.  Nevertheless, given the Court's recognition that individuals can establish and contribute to annuities with terms and conditions of their choosing, a debtor's intention to obtain an annuity that provides retirement income should be accorded probative weight.  <u>See</u> <u>Silliman v. Cassell</u>, 738 S.E.2d 606, 612 (Ga. 2013) (noting that, under a similar Georgia exemption statute, the trustee bore the burden to show that "the payments were not intended to substitute for wages").

Here, the Debtors clearly intended the Annuity to provide them with income that substituted for lost wages.  Ms. Wainer testified that they purchased the Annuity to obtain

guaranteed retirement income for their current and future expenses.  (Hr'g Pt. 2 at 26:15, 46:00).

Consistent with this stated intent, the Debtors started drawing monthly distributions from the

Annuity immediately after purchase.  (Hr'g Pt. 2 at 25:45).  And, the Debtors do not intend to

redeem or liquidate any increased value in the Annuity because doing so would reduce the level

of income that they believe they need.  (Hr'g Pt. 2 at 52:30).

The Trustee does not dispute the Debtors' assertion that they intended to use the Annuity

as a substitute for lost income.  Consequently, I find that this factor supports the Debtors'

exemption claim.[19]

### b.  Were the contributions made over time?

The second Andersen factor asks whether the contributions to the annuity were made

over time.

This factor seems to have developed, at least in part, due to the specific Iowa exemption

statute at issue in the Eilbert cases.  When announcing this factor, the Eilbert I decision stated

that the applicable Iowa exemption statute "clearly contemplates an *on-going* course of

investment and contribution over time."  Eilbert I, 212 B.R. at 958-59.  The Eighth Circuit in

Eilbert II appeared to anchor its consideration of this factor in the unique provisions of Iowa's

exemption statute, which excluded from exemption any payments resulting from recent

contributions above the normal and customary level.  See Eilbert II, 162 F.3d at 527.

---

[19]      The Trustee argues that the Annuity payments do not meet the §522(d)(10)(E) standard of
providing a substitute for wages "simply because, with sound financial planning, [the Debtors] use them
that way."  (Tr. Post-Hr'g Mem. at 2).  However, courts have treated intent with actual usage as
supportive of a finding that such payments are exemptible.  See, e.g., Cassell, 443 B.R. at 205; Andersen,
259 B.R. at 692; In re McFarland, 500 B.R. 279, 285 (Bankr. S.D. Ga. 2013), aff'd sub nom. McFarland
v. Wallace, 516 B.R. 665 (S.D. Ga. 2014), aff'd sub nom. In re McFarland, 790 F.3d 1182 (11th Cir.
2015).

This rationale for the second <u>Andersen</u> factor is not readily applicable to the federal exemption statute. The <u>Eilbert II</u> reasoning applies solely to the unique limiting language of the Iowa exemption statute, which §522(d)(10)(E) does not share.[20] I perceive nothing in the text or legislative history of §522(d)(10)(E) to indicate that it only encompasses plans (including annuities) funded by an on-going course of investment and contribution.

How the second <u>Andersen</u> factor comports with <u>Rousey</u> also is unclear. The facts before the Court in <u>Rousey</u> involved debtors who had been forced to take a lump-sum distribution from their employer-sponsored pension plans, which they deposited into IRA's. <u>Rousey</u>, 544 U.S. at 322. Although the final investment vehicles claimed as exempt — the IRAs — were funded with a lump-sum deposits, the debtors almost certainly earned their pensions over time during the course of their employment. In any event, the Court simply did not address the impact a short- or long-term investment period would have in determining whether the plan itself qualified under §522(d)(10)(E).

However, the Supreme Court did observe that, in contrast to employer-sponsored retirement plans, "an individual can establish and contribute to an annuity on terms and conditions he selects." <u>Rousey</u>, 544 U.S. at 331. This statement seems to countenance a wide range of investment strategies leading to the purchase of an annuity. I thus question whether a debtor's decision to purchase an annuity with a lump sum, rather than contributing over time, should factor into the exemptibility analysis. Moreover, even the <u>Andersen</u> court diluted the weight of this factor by holding that a lack of contributions over time was deserving of minimal

---

[20]    The Eighth Circuit recognized that the Iowa exemption statute is "materially different" from §522(d)(10)(E). <u>See</u> In re Rousey, 347 F.3d 689, 693 (8th Cir. 2003), <u>rev'd sub nom. on other grounds</u> Rousey v. Jacoway, 544 U.S. 320 (2005).

weight where a debtor did not have other opportunities through employment to obtain a pension-like plan through ongoing contributions.  Andersen, 259 B.R. at 692.[21]

But regardless of whether the second Andersen factor is applicable to exemptibility questions under §522(d)(10)(E), it only helps the Debtors here.

The Trustee does not dispute that the Debtors saved for the purchase of their Annuity during their working years.  After maxing out their contributions to other retirement options for any given year, the Debtors set aside what additional funds they could in a Schwab account in order to save for retirement.  (Hr'g Pt. 2 at 3:15, 5:30).  In 2011, Ms. Wainer liquidated the small pension she earned for $13,000.00, placed those funds in the Schwab account (Hr'g Pt. 2 at 2:45, 49:30), and used those funds in purchasing the Annuity in 2013.  (Hr'g Pt. 2 at 2:45).

Particularly because the Debtors saved the funds in the Schwab account as part of their retirement strategy, it makes more sense to consider the Annuity as the product of the Debtors' contributions of income over time rather than the product of a lump-sum purchase.  See In re Kiceniuk, 2012 WL 4506597, at *5 (Bankr. D.N.J. Sept. 28, 2012) (holding that an annuity purchased with funds from a 401(k) account, to which the debtor contributed over time, was exemptible under §522(d)(10)(E)).

It also is significant that the reason the Debtors saved additional amounts during their working years was the limited employer-sponsored retirement options available to them.  See Andersen, 259 B.R. at 692 (single-payment purchase of an annuity deserving of less weight where the debtor had no other opportunity through her employment to obtain a pension plan).  Assuming that this second Andersen factor is applicable, I agree with the Andersen court that debtors should not be penalized because they had to purchase their own annuities for retirement

---

[21]   This qualification is reasonable.  However, the existence of a reasonable exception does not provide justification for employing this factor in the first place.

income when their employers did not offer any significant retirement plans.  Id.; accord Cassell,

443 B.R. at 207.

For these reasons, I find that the Debtors' single-payment purchase of the Annuity does

not weigh against their exemption claim.

### c.  Do multiple contributors exist?

The third Andersen factor, "multiple contributors" (similar to the second factor), stands

on unstable footing,.

The Eilbert I opinion stated, without explanation, that the Iowa exemption statute

contemplated "multiple contributors."  Eilbert I, 212 B.R. at 959.  Accordingly, investments

purchased "outside the context of workplace contributions" were deemed less likely to be

exempt.[22]  Id.  However, there is nothing in the text or legislative history of §522(d)(10)(E) that

indicates plans funded by a single contributor would be less likely to qualify for exemption, or

vice versa.

Rousey also undermines reliance on this factor to determine exemptibility.  The Court

recognized that individuals — rather than employers — would generally "establish and

contribute to" annuities.  Rousey, 544 U.S. at 331.  Thus, the Court seemed to recognize

implicitly that, by their nature, annuities will not be funded in the same fashion as conventional

pension plans.

Even if the third factor were applicable, it would not cut against the Debtors' exemption

claim.

---

[22]     The Eilbert II court did not reference the number of contributors — or lack thereof — as a factor
in its decision.

Recognizing the potential inequity in woodenly applying this factor, the <u>Andersen</u> court stated that where a debtor had limited or no access to employer-sponsored retirement programs, the lack of multiple contributors "should be afforded less weight."[23]  <u>Andersen</u>, 259 B.R. at 692; <u>see also</u> <u>Cassell</u>, 443 B.R. at 206.  Mr. Wainer earned two (2) modest pensions through his employers, but Ms. Wainer did not have access to such retirement benefits through most of her working years as a preschool teacher.  (Hr'g Pt. 2 at 4:00).  In this context, therefore, the fact that the Debtors self-funded their Annuity does not weigh against their exemption claim.[24]

### d.  What is the return on investment?

The fourth <u>Andersen</u> factor examines the return on the investment that the annuity would provide to the debtor.

In <u>Eilbert I</u>, the court asserted — again without explanation — that an investment that returns only the initial contribution with earned interest is more likely to be a non-exempt investment; and, <u>vice versa</u>, investments that "compute payments based on the participant's estimated life span, but which terminate upon the participant's death or the actual life span" more closely resemble exemptible plans under the Iowa exemption statute.  <u>Eilbert I</u>, 212 B.R. at 959.

Given the <u>Eilbert I</u> court's lack of explanation for the imposition of this factor as a requirement for exemptibility, it is difficult to determine whether it is an appropriate standard.

---

[23]    Again, however, the existence of this reasonable carve-out to the third factor does not mean that it is appropriate to consider the factor in the first place in determining exemptibility under §522(d)(10)(E).

[24]    The Trustee asserts that because the Annuity is a self-purchased investment, it is automatically disqualified for exemption under §522(d)(10)(E).  (Tr. Reply at 2).  This assertion cannot be squared with <u>Rousey</u>'s recognition that individuals can establish annuities outside of the employment context.

Perhaps the <u>Eilbert I</u> court was influenced by the fact that the Iowa exemption statute only listed two (2) concrete types of plans (and a catch-all) from which payments could be exempted: "pension, annuity, or similar plan or contract." <u>See</u> Iowa Code §627.6.8.e. That may explain why the court felt that annuities that most resembled traditional pensions fall within the scope of the Iowa exemption.[25]

With respect to this fourth <u>Andersen</u> factor, I again find no basis in the text or legislative history of §522(d)(10)(E) that would justify limiting its scope to annuities that closely resemble traditional pension plans. Compared to its Iowa analogue, the federal exemption embraces a broader group of plan types from which payments may be exempted: "stock bonus, pension, profitsharing, annuity, or similar plan or contract." <u>See</u> §522(d)(10)(E).

It also is significant that <u>Rousey</u> recognized an individual could set up a §522(d)(10)(E) annuity "on terms and conditions he selects." <u>Rousey</u>, 544 U.S. at 331. The Court observed that "annuity" is broadly understood to denote annual income from investments, sometimes including "the ultimate return of both principal and interest." <u>Id.</u> at 331 n.8 (citation omitted). While I do not take this dictum as supporting the proposition that any investment plan labeled as an "annuity" falls under §522(d)(10)(E), at a minimum, it demonstrates that the statute does not narrowly constrict that group. At bottom, <u>Rousey</u> held that plans providing wage-replacing income fall within the ambit of §522(d)(10)(E). The return on investment that an annuity provides is not probative to that inquiry.

The fourth <u>Andersen</u> factor would exclude from the scope of §522(d)(10)(E) (or at least weigh against inclusion) certain wage-replacing annuities on the grounds that the plan returns the

---

[25]    The Eighth Circuit in <u>Eilbert II</u> did not discuss the "return on investment" factor in its decision.

investment principal with interest.  Such a result is unjustified by the statute and likely conflicts with Rousey.

If applicable, this fourth Andersen factor would weigh neither for nor against the Debtors' exemption claim.

The Annuity appears to be something of a hybrid between a pension that pays a certain level of income for life and an annuity that returns the principal with interest over a set number of years.  Once the Debtors began drawing income from the Annuity (which they did immediately after purchase), a "protected base" amount locked into place.  (Hr'g Pt. 1 at 50:30). No matter what happened to the corpus of the Annuity from that point on, the Debtors would be able to withdraw five percent (5%)of the protected base amount each year, for life.  (Hr'g Pt. 1 at 48:45).  The Annuity also permitted the Debtors to cancel the contract at any time and receive the "surrender value."  (Hr'g Pt. 1 at 40:00).

So, the Annuity provided guaranteed lifetime income to the Debtors, while also permitting them to withdraw whatever corpus remained in the account at any time.  Although I do not find the fourth Andersen factor to be applicable, the structure of this Annuity has investment elements of both a simple return of principal and interest and pension-type income. The fourth Andersen factor is therefore largely a non-factor.

### e.   What control may the debtor exercise over the asset?

The fifth Andersen factor examines the degree of control the debtor can exercise over the annuity.

According to Eilbert I, the more control a debtor has over the corpus of the annuity, the more likely it resembles a non-exemptible investment.  A debtor's "complete discretion to withdraw the entire corpus" is the pinnacle of this control.  Eilbert I, 212 B.R. at 959.

I again see little basis for such a limitation onto the types of annuities that can fall under §522(d)(10)(E).  No such restriction is suggested or implied by the statute's text or legislative history, and the Eilbert I opinion gives no reason for weighing in favor of non-exemptibility when the annuity gives a debtor significant control over the corpus of the investment.

Further, the weighing of this type of control against non-exemptibility is contradicted by Rousey.

In holding that IRAs were exemptible plans under §522(d)(10)(E), the Rousey Court found "unpersuasive" the trustee's argument that IRAs could not be similar plans or contracts because the debtors had complete access to them.  Id. at 332.  The debtors in Rousey likely were not 59 ½ at the time they filed their joint bankruptcy petition, and therefore were not at that time entitled to withdraw their IRA funds without paying the ten percent (10%) early-withdrawal IRS tax penalty.[26]  However, there is no indication in Rousey that the Court would have reached a different result if the debtors had been over the age of 59 ½ and therefore eligible to withdraw the entire amount of the IRA penalty-free.  In other words, the ability of the Rousey debtors to withdraw the entire corpus of their IRAs did not in any way hinder their ability to exempt their right to payments from those accounts.

---

[26]    Although none of the decisions stated the debtors' ages, the bankruptcy court in Rousey noted that the debtors' withdrawal of funds from their IRAs would have triggered the ten percent (10%) early-withdraw penalty.  See In re Rousey, 275 B.R. 307, 309 (Bankr. W.D. Ark. 2002), aff'd, 283 B.R. 265 (B.A.P. 8th Cir. 2002), aff'd, 347 F.3d 689 (8th Cir. 2003), rev'd sub nom. Rousey v. Jacoway, 544 U.S. 320 (2005).  Therefore, I infer that the debtors had not yet reached the age of 59 ½.

Here, the Trustee observes that the Debtors are "completely free to redeem, cancel,
modify the ratio of investments, change beneficiaries, alter the payment terms, or even assign the
Annuity to a third party as they would with any other asset."  (Tr. Mem. at 5).  Citing to In re
Matthews, 65 B.R. 24 (Bankr. N.D. Iowa 1986),[27] he argues that the Debtors' "plenary control
by itself disqualifies the exemption."  (Tr. Mem. at 5).

In light of Rousey, I find these elements of control irrelevant to the Debtors'
§522(d)(10)(E) exemption claim.  The debtors in Rousey had plenary control of the funds in their
IRAs, subject only to the age-based penalty for early withdrawal.[28]  Accordingly, the Debtors'
ability to liquidate the corpus of the Annuity does not cut against exemptibility.


### f.   Was the investment a prebankruptcy planning measure?

The final Andersen factor asks whether a debtor's acquisition of the plan or contract was
a prebankruptcy planning measure.

This factor appears to be the primary animating force behind the Eilbert decisions that
created the Andersen factors themselves.  The Eilbert debtor presented the courts with an
"egregious" set of facts: an elderly debtor, faced with a large personal injury judgment, utilized

---

[27]    Matthews held that a debtor's IRA was not exempt under an Iowa exemption statute.  To the
extent such a holding could have been marshalled in support of a similar case involving an exemption
claim under §522(d)(10)(E), it has been overruled by Rousey.

[28]    The only "control" deprived of the Rousey debtors over their IRAs — that the Debtors here retain
over their Annuity — was the ability to keep the corpus of the investment in the account.  The IRAs'
required minimum distribution meant that the Rousey debtors would have been effectively forced to
liquidate the accounts starting at age 70 ½.  However, the Eilbert I court was concerned with the opposite
kind of control: the ability to withdraw the corpus.

benefits received as a result of her husband's death to purchase an annuity in an attempt to cleanse the funds and defeat the valid claim of her judgment creditor.  See Andersen, 259 B.R. at 692-93.  According to the Andersen panel, "it was not a difficult task to determine that the contract in Eilbert was not of the kind contemplated by the state statute being utilized to claim the annuity as exempt."  Id. at 693. [29]

The Eilbert case can be seen as an analogue to decisions in which courts have wrestled with the issue of pre-bankruptcy asset conversion.  See, e.g., Norwest Bank Nebraska, N.A. v. Tveten, 848 F.2d 871 (8th Cir. 1988) (affirming a decision that denied a discharge, on the ground of fraud, to a debtor who liquidated almost all of his non-exempt property on the eve of bankruptcy and converted it into exempt property worth approximately $700,000); In re Smiley, 864 F.2d 562 (7th Cir. 1989) (denial of discharge warranted where a debtor hindered creditors by misleading them regarding his assets in order to have time to establish residency in a state with more favorable exemption laws).  At bottom, such cases reflect judicial concern over the unlimited exemptions available in some states.  See Tveten, 848 F.2d at 878-79 (Arnold, J., dissenting) (noting that the applicable Minnesota exemption was unlimited in amount, and questioning the role of courts in determining "when this [debtor] pig becomes a hog").

Like Tveten, Eilbert involved a debtor claiming a large exemption under a state statute that imposed no limit to the amount exemptible.  It is therefore unsurprising that, faced with a debtor who engaged in hog-like conversion, the Bankruptcy Appellate Panel and Eighth Circuit found ways to deny the debtor her exemption.  It is thus possible to view all the other Andersen

---

[29]     Other courts have also referenced the potential for abuse of the exemption as a justification for confining the scope of similar exemption statutes.  See In re McFarland, 500 B.R. 279 (Bankr. S.D. Ga. 2013), aff'd sub nom. McFarland v. Wallace, 516 B.R. 665 (S.D. Ga. 2014), aff'd sub nom. In re McFarland, 790 F.3d 1182 (11th Cir. 2015); In re Green, 2007 WL 1031677, at *3 (Bankr. E.D. Tenn. Apr. 2, 2007); In re Michael, 339 B.R. 798, 806-07 (Bankr. N.D. Ga. 2005).

factors as signs that a debtor might be engaged in some form of improper prebankruptcy
planning.

I need not say much about the applicability of the sixth <u>Andersen</u> factor to the federal
exemption statute at §522(d)(10)(E).  One could certainly argue that concern over excessive
prebankruptcy planning is minimized with respect to the federal exemption due to the statutory
limitation of such exemption to amounts "reasonably necessary" for the debtor's support.  11
U.S.C. §522(d)(10)(E).  The factors applicable to that inquiry (discussed below in Part III.C.)
ensure that most people will not be able to squirrel away assets on the eve of bankruptcy into a
limitless annuity.  And, there is always the potential for blocking troubling prepetition debtor
conduct with invocation of the requirement that debtors invoke their bankruptcy rights in good
faith.  <u>See</u> <u>In re Tamecki</u>, 229 F.3d 205 (3d Cir. 2000) (good faith requirement in chapter 7
cases); 11 U.S.C. §1325(a)(3), (a)(7) (good faith filing requirement and good faith plan proposal
requirement in chapter 13 cases).  Thus, a strong case can be made for the proposition that the
sixth factor is not germane to the §522(d)(10)(E) exemption allowance inquiry at all.

But regardless of whether consideration of this factor in an §522(d)(10)(E) exemptibility
analysis is proper, the Debtors here clearly did not engage in prebankruptcy planning when they
purchased their Annuity in 2013.  Ms. Wainer testified that the Debtors purchased the Annuity to
ensure guaranteed income for their ongoing expenses.  (Hr'g Pt. 2 at 26:15, 46:00).  The Debtors
did not encounter debt problems until three (3) years later after they purchased the Annuity and,
even then, at that time, they began curtailing life expenses and selling some stock holdings and
continued to pay creditors.  (Hr'g Pt. 2 at 13:00-15:30).  The Debtors then waited another four
years to file for bankruptcy.  This timeline is inconsistent with a prebankruptcy planning scheme
that should result in the forfeiture of the Debtors' exemption rights under the Code.

Accordingly, the circumstances surrounding the Debtors' purchase of their Annuity do not support a finding of non-exemptibility.

### g.  Conclusion

None of the applicable <u>Andersen</u> factors cuts against the Debtors' exemption claim.  The only factor that could have done so — "control over annuity" — is unwarranted by the text and legislative history of §522(d)(10)(E) and has been eviscerated by <u>Rousey</u>.

The better approach to determining whether an annuity falls with the statutory ambit of §522(d)(10)(E), in my view, is simply to follow the Supreme Court's analysis in <u>Rousey</u>.  An annuity is exemptible if the payments provide a substitute for wages.

As discussed, to answer that question, <u>Rousey</u> examined the specific provisions of the plan in question.  Traditional IRAs provided income as a substitute for wages lost upon retirement because IRAs contained multiple provisions that encouraged accountholders to abstain from early withdraws and use those funds in retirement years.  <u>Rousey</u>, 544 U.S. at 331-32.

Much for the same reasons outlined in the "account of age" section, the Debtors' Annuity also provides such replacement income to the Debtors.  The IRS imposes a ten percent (10%) tax penalty on any account gains withdrawn prior to the annuitant reaching the age of 59 ½, and the penalty structure ensures that the maximum penalty applies first before the principal investment can be withdrawn penalty-free.  Further, the Annuity contract itself incentivizes annuitants to leave funds in the account by failing to establish a protected base amount until the annuitant is 59 ½.  While in some respects, the Annuity does not impose as severe of penalties for early withdrawals as a traditional IRA would, nor force the annuitant to withdraw funds after the age

of 70 via tax penalties, these differences do not, in my view, render the Annuity a "mere savings account."  See id. at 329.

I recognize that, due to the age of the Debtors when they purchased the Annuity, these limitations were functionally irrelevant.  The Trustee is correct to note that the Debtors were free to liquidate their Annuity at any time after its purchase, which permitted the Annuity to function more like a savings account.  However, permitting such context to control the outcome here would unfairly punish the Debtors for Ms. Wainer's choice of working most of her career for an employer who did not offer her a pension, which would have indisputably been exemptible. Particularly here, where there is no dispute that the Debtors have actually used their Annuity for retirement income since 2013 (in the same way as their exempt IRAs and pensions), I find no ground for holding that the Annuity is not exemptible under §522(d)(10)(E).

### C.  Reasonably Necessary for Support

#### 1.

The third and final requirement that §522(d)(10)(E) imposes is that the right to receive a payment may be exempted only "to the extent" that it is "reasonably necessary [to] support" the debtor and his dependents.  Rousey, 544 U.S. at 325 (alteration in original) (quoting 11 U.S.C. §522(d)(10)(E)).

To determine whether payments are "reasonably necessary," courts have considered a number of factors, including:

(1)   the debtor's present and anticipated living expenses;

(2)   the debtor's present and anticipated income from all sources;

(3)    the age of the debtor and his dependents;

(4)    the health of the debtor and his dependents;

(5)    the debtor's ability to earn a living;

(6)    the debtor's job skills, training and education;

(7)    the debtor's other assets, including exempt assets;

(8)    the liquidity of other assets;

(9)    the debtor's ability to save for retirement;

(10)  the special needs of the debtor and his dependents; and

(11)  the debtor's continuing financial obligations, e.g., alimony or support payments.

In re Booth, 331 B.R. 233, 236-37 (Bankr. W.D. Pa. 2005) (citing In re Gralka, 204 B.R. 184,

190 (Bankr. W.D. Pa. 1997)).

The extent of payments reasonably necessary to support the debtor is limited to the

amount sufficient to meet the debtor's basic needs, not the lifestyle to which the debtor had

grown accustomed prior to bankruptcy.  See In re Morehead, 283 F.3d 199, 203, 207 (4th Cir.

2002) (interpreting a West Virginia exemption statute identical to §522(d)(10)(E)); In re Brewer,

154 B.R. 209, 213 (Bankr. W.D. Pa. 1993).

Applying this standard here, I find that the Trustee has not met his burden to show that

the Debtors' exemption of the Annuity payments was not properly claimed.

At the hearing, the Debtors submitted spreadsheets setting forth their projected income and

expenses from 2020 through 2034.  (See Debtors' Ex. D-2 (hereinafter "Projected Budget")).

The Debtors' Projected Budget contains three (3) hypothetical income and expense

calculations: one assuming that both Debtors survive though 2034, one assuming Mr. Wainer

predeceases Ms. Wainer, and one assuming Ms. Wainer predeceases Mr. Wainer.  Without

reproducing the Projected Budget here, it suffices to say that under each scenario, the Debtors' projected expenses will exceed their projected income in the near future. Specifically with respect to the scenario in which both Debtors survive through 2034, the Debtors' cash flow becomes negative in 2022 even considering the Annuity income. I will analyze the Trustee's objection from the perspective of this scenario.[30]

I need not walk through all the factors applicable to the "reasonably necessary for support" analysis. The Debtors' situation simplifies the equation — their expenses and income are somewhat fixed, they are retired and unable to return to work, have no dependents, and have a set amount of assets.

I am satisfied that the Debtors' Projected Budget, if accepted as accurate, sets forth a plausible basis upon which to rule for the Debtors. It includes facially reasonable expense amounts for retirement home rent, telephone/internet, food, personal care, medical, transportation, insurance, entertainment, and other necessary costs. Other than the rent, which I discuss below, the Trustee has not challenged any of these expenses. And, since the Trustee bears the burden to show that the Debtor's claim of exemption in the Annuity is not proper, I will address his specific objections in turn.

---

[30]     Neither party has advocated for using a different scenario.

Nevertheless, I recognize that resolution of this issue involves potentially difficult questions of law. It is not clear what time frame a court should consider when deciding what is "reasonably necessary" for support of elderly debtors. Here, the Debtors calculate out expenses for an additional thirteen (13) years, at which time they will both be in their nineties (90's). As discussed below, if both survive that long, then they will need their Annuity income and may have little assets left for continued support. However, as shown by the Projected Budget, if one spouse predeceases the other in the next few years then the surviving spouse will have significantly more income than reasonably necessary for support.

However, the Trustee bears the burden on his Objection and has not argued that an alternative time frame be used. I therefore opt to use the Debtors' suggested timeframe.

**2.**

The Trustee first takes issue with the Debtors' calculation of their projected rental

payments at Spring House Estates.  The Debtors project that these rental payments will increase

by four percent (4%) annually, which the Trustee alleges is an arbitrary projection.  (Tr. Mem. at

9).  However, I find that this projection is reasonable in light of the increase in rent that the

Debtors have experienced since moving into Spring House Estates in 2016.  The Debtors

monthly rent when they signed the ACTS contract was $4,567, and the current rent stands at

$5,408.  (See ACTS Contract at 5; Debtors' Ex. D-9 at 1).  While I calculate the annual increase

in rent over this five-year period to be closer to three-and-one-half percent (3.5%), such an

adjustment would not make a material difference to the outcome of this decision.[31]

The Trustee next argues that the Debtors calculations assume they will remain in their

three-bedroom apartment at Spring House Estates, when they could move to a smaller unit.  Such

a move, according to the Trustee's interpretation of the ACTS Contract, would result in a lower

monthly rent and a refund of a portion of the Spring House Estates entrance fee.  (Tr. Mem. at 9).

On this point, I find the Trustee's assertions contrary to the record.  Ms. Wainer testified

that they had already moved from their original three-bedroom apartment into a two-bedroom

"combo apartment."  (Hr'g Pt. 2 at 33:05).  Rather than reduce their rental payments, however,

this move gave the Debtors back some of their entrance fee, in the amount of $20,000.  (Hr'g Pt.

2 at 33:15).  The Debtors used this money to pay some debts, attorneys' fees, and back taxes.

(Hr'g Pt. 2 at 34:15).

---

[31]     See n.39, infra (explaining how, after adjusting the Debtors' projected income to appropriate
levels and assuming a three-and-one-half percent (3.5%) rent appreciation, the Debtors would still need
the income from the Annuity to cover their expenses over the Projected Budget's timeframe).

To the extent that the Trustee is challenging the reasonableness of the Debtors' rental expense, his challenge fails. The Debtors have already moved to a smaller apartment at Spring House Estates in an attempt to save money, and the Trustee has not developed the record regarding viable cheaper options available to the Debtors at Spring House Estates or elsewhere.

### 3.

The Trustee's final substantive challenge is more difficult to analyze due to the incomplete nature of the record. Put simply, however, the Trustee asserts that the Debtors' projected income would easily cover their projected expenses.

For the year 2020, the Debtors list their monthly income from pensions, Social Security, and IRAs — but excluding any payments from the Annuity — as $7,290. (Projected Budget at 1). By contrast, the Trustee calculates that the 2020 monthly income from these sources is $10,810.[32] (See Tr. Mem. at 10). The Trustee's calculation exceeds the Debtors' stated monthly income for 2020 of $7,980 by almost $3,000 and would be more than sufficient to cover their expenses for 2020 and later years. Accordingly, the Trustee contends that the Debtors do not need their Annuity income to pay for their projected expenses. (Id.).

I find problems with both parties' calculations of the Debtors' income.

Initially, I agree with the Debtors that the Trustee has at least partially miscalculated their income. The Trustee's Memorandum lists the Debtors as receiving $3,542 per month from Mr. Wainer's Lockheed Martin and Boeing pensions, when the actual combined monthly income from these pensions is $1,338. (Compare Tr. Mem. at 10, with Debtors' Ex. D-4 at 1, 5).

---

[32]    The Trustee does not specify which calendar year this income calculation represents; however, the Social Security payments he used ($3,757) indicates that the Trustee is referring to year 2020. (See Projected Budget at 1 (listing the Debtors' combined Social Security income for year 2020 as $3,757.90)).

Accounting for the correct pension income amount, the Trustee's calculation of the Debtors'

2020 monthly income (exclusive of any Annuity income) falls from $10,810 to $8,607.

Corrected to the appropriate amount, the Trustee's calculation of $8,607 in monthly

income for 2020 exceeds the Debtors' projected expenses for 2020 of $6,532.  (See Projected

Budget at 1).  So, despite his miscalculation, the Trustee's essential challenge to the sufficiency

the Debtors' income remains.

Turning to the Debtors' calculation of their monthly income, I find it somewhat opaque.

Confusingly, the Projected Budget lists income from "Retirement & Pension" as an

undifferentiated category.  (See Projected Budget at 1).  According to the Debtors, this category

includes income from both Mr. Wainer's pensions and the IRA distributions.  (See Debtors'

Reply at 14).  However, the Debtors have failed to provide the court with the method by which

they plan to liquidate their IRAs over time for income.[33]  Subtracting the monthly pension

income ($1,338) from the "Retirement & Pension" category, it appears the Debtors plan to

liquidate enough of their IRAs to receive $2,194 in monthly income.

By contrast, the Trustee suggests that the income available to the Debtors from their

IRAs should be computed by using a thirteen-year (13-year) liquidation schedule.  (See Tr.

Mem. at 10).  The Debtors' IRAs (and $15,069 in other exempted funds) are cumulatively worth

about $548,000, which liquidated over thirteen (13) years would give the Debtors an additional

$3,512 per month.  (Id.)  In response to the Trustee's suggested thirteen-year (13-year)

liquidation, the Debtors did not object.  (See Debtors' Reply at 14).  Thus, in the absence of an

---

[33]     Ms. Wainer did discuss the existence of a required minimum distribution from their IRAs, which
she believed was ten percent (10%), but did not provide any further specificity.  (See Hr'g Pt. 2 at 19:45,
36:45).

explained and reasonable alternative, I adopt the Trustee's thirteen-year (13-year) liquidation analysis in computing the Debtors' income.

My analysis therefore begins with the evidence shows the Debtors had $8,607 in monthly income (excluding any Annuity income) for the year 2020. As noted, this significantly exceeded their expenses for that year of $6,532.[34] However, for a few reasons I find that the Trustee has failed to carry his burden of showing that the Debtors' Annuity income is not reasonably necessary for their support.

First, the record shows that most of the Debtors' income is taxable. Ms. Wainer testified that taxes for IRA distributions are not reflected in the Projected Budget. (Hr'g Pt. 2 at 19:30; see also Debtors' Ex. D-7 (listing IRA "gross distributions" in equal amounts as "taxable amounts"); Debtors' Ex. D-8 (showing $2,543.94 in "Taxes, Fees and Expenses" in the "Year-to-Date" IRA balance calculation)). And, in fact, the Debtors' tax returns for 2019 show that they paid $8,885 in federal taxes on $104,287 in taxable income.[35] (See Tr. Ex. T-7 at 5-6).

Although neither party has developed evidence regarding this topic, I consider it likely and infer that the Debtors incurred a similar tax bill in 2020. If the Debtors had a monthly income in 2020 without the Annuity of $8,607, the Debtors would have $103,284 in annual income. This is just shy of the Debtors' taxable income in 2019 of $104,287. Therefore, in the

---

[34] I note that Ms. Wainer testified that the Debtors' expenses for 2020 were abnormally low, as they were confined to Springhouse Estates for three months because of COVID and did not have some of their usual expenses for clothes, medical care, haircuts, etc. (Hr'g Pt. 2 at 12:00).

[35] The Debtors' 2019 tax returns also show a gross income of $111,634, indicating that they had an additional $7,347 in income that was not taxed. (See Tr. Ex. T-7 at 5). However, I do not use this amount as a benchmark for determining the Debtors' ongoing income, as the Debtors were still paying creditors at that point and liquidating some additional stock to do so. (See Hr'g Pt. 2 at 13:00).

absence of any further specificity from the record, I will assume that the Debtors paid approximately $8,885 federal tax in 2020.

Taking the Debtors' 2020 tax bill into account, their $8,607 in gross monthly income would have been reduced by $740.  In 2020, the Debtors therefore would have had $7,867 in after-tax monthly income.

Starting with this amount, the Debtors' after-tax monthly income for each successive year can be calculated.  Only the Debtors' Social Security payments can increase over time, as the monthly pension payments and IRA liquidation amounts stay constant.  The Debtors have projected that their Social Security payments will increase by two percent (2%) per year, which the Trustee has not disputed.  (See Projected Budget at 1).  The Debtors' projected after-tax income in any year after 2020 can therefore be calculated by the following method: (1) start with their 2020 monthly after-tax income of $7,867; (2) for any later year, find the difference between the 2020 Social Security payments and those in that later year (using the Projected Budget); and (3) add that amount to $7,867.[36]

Without any annuity income, this methodology shows that the Debtors will have a projected negative cash flow by year 2022.  For 2021, the Debtors' monthly expenses are projected to be $7,609, and their projected income is $7,916.  However, their monthly expenses in 2022 are projected to rise to $8,208, while their projected income will be just $7,992.  (See Projected Budget at 1).  From that point on, since their expenses are projected to increase at a

---

[36]    For example, in 2021, the Debtors will receive monthly Social Security payments in the amount of $3,806.  For 2020, the Debtors only received $3,757 in monthly Social Security payments.  The difference between these amounts is $49.  The Debtors' projected monthly after-tax income for 2021 is therefore $7,916.

faster rate than their income,[37] the Debtors will run increasing monthly deficits.  By the end of

the Projected Budget in 2034, the Debtors' projected monthly expenses are $11,765, and their

projected monthly income is $9,034.

Adding the monthly income from the Annuity ($690) would keep the Debtors' cash flow

in the black only through 2024.  In 2021, the Annuity income would give the Debtors a monthly

income surplus of $997.  (See Projected Budget at 1 (expenses at $7,609, income calculable at

$8,606)).  But by 2025, the Debtors' expenses are projected to be $9,045, exceeding their

projected income of only $8,920.[38]  By 2034 their projected total monthly income ($9,724) will

fall short of their projected expenses ($11,765) by over $2,000.

In light of these facts, resolution of the Trustee's objection appears relatively

straightforward.  Taking the Projected Budget's thirteen-year (13-year) period into account, the

Debtors' total after-tax income — including income from the Annuity — will fall short of their

total expenses.  While the Debtors will have an income surplus in the first few years of their

budget, that surplus is significantly outweighed by larger deficits in later years.[39]

---

[37]    There is one exception to this trend.  In 2027, an ongoing $416 line-item expense for "car payment" goes to $0.  While the Debtors' other expenses are projected to appreciate each year, elimination of this car payment reduces the Debtors' 2027 expenses by $106 compared to the prior year. (See Projected Budget at 1).

[38]    This amount is the sum of the Debtors' 2020 income of $7,867 per month, the projected $363 increase in Social Security payments from 2020 to 2025, and $690 in monthly income from the Annuity.

[39]    Assuming a reduced appreciation of the Debtors' rental payments at Spring House Estates (3.5% instead of 4%) does not change this outcome.  In that scenario, the Debtors would remain net cash flow positive for an additional year.  Their 2026 rental payments would be $6,423 instead of $6,616, bringing their total expenses for 2026 down from $9,435 to $9,152.  This exceeds their projected 2026 income (including Annuity income) of $9,002.  The Debtors would therefore be cash flow positive for the first five years and the seventh year (2021 to 2025, then 2027 (due to a $416 car payment ending that year)), but cash flow negative for the last eight out of nine years (2026, then 2028 to 2034).

Accordingly, I find that the Trustee has not carried his burden to show that the Debtors' claim of exemption in the full amount of their Annuity payments is not reasonably necessary for their support.

## IV.  CONCLUSION

For the reasons stated above, the Trustee's Objection will be overruled.  The Trustee has failed to show that the Debtors' Annuity payments do not replace lost wages, do not arise on account of age, or are not reasonably necessary for the support of the Debtors.

An appropriate Order follows.

Date:   November 16, 2021        _____
                                 **ERIC L. FRANK**
                                 **U.S. BANKRUPTCY JUDGE**